IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | 1:09cv00363 |
| JASON HOPE, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER
ON PRELIMINARY INJUNCTION**

THOMAS D. SCHROEDER, District Judge

Before the court is the motion of Plaintiff Philips Electronics North America Corporation ("Philips") to preliminarily enjoin its former employee, Defendant Jason Hope ("Hope"), from competing with it and from using or disclosing alleged confidential and proprietary information, pursuant to Federal Rule of Civil Procedure 65(a). (Doc. 7.) After notice and a hearing, the court granted motions for a temporary restraining order ("TRO") and expedited discovery. (Doc. 21.) Post-discovery briefing was filed (Docs. 25 & 31) and on June 1, 2009, the court held a hearing and renewed the TRO with the consent of the Defendant. For the reasons set forth herein, Philips' motion for preliminary injunction will be granted.

## I.  BACKGROUND

The court finds the following facts based on the Verified Complaint (Doc. 1), depositions, affidavits and evidentiary record filed by the parties.  Philips is a Delaware corporation with its principal place of business in Massachusetts.  (Doc. 1 ¶ 1.)  On May 9, 2007, Philips acquired Netalog, Inc., which operated under the name Digital Lifestyle Outfitters ("DLO"), by purchasing all of its issued and outstanding stock.  (Doc. 28, Ex. D, Pt. 2 at 37, Pt. 3 at 4.)  Although DLO became a subsidiary of Philips, DLO operated as a separate business entity under its own brand name until it merged with Philips on January 1, 2009.  (Doc. 25, Ex. A at 3-4; Doc. 29, Ex. D, Pt. 5 at 25; Doc. 37 at 17.)  Philips now operates DLO's business within its Consumer Lifestyle Division.  (Doc. 19 at 3.)

In March 2006, DLO operated from its headquarters in Durham, North Carolina.  (Doc. 1 ¶¶ 2-3.)  DLO was one of the first companies to produce iPod™ accessories and was a leading MP3 and mobile phone accessory supplier in the United States.  (Doc. 1 ¶ 7.)  DLO sold these products to national retail stores, such as Best Buy Co., Inc. ("Best Buy"), which marketed and sold them on the Internet and in retail stores throughout the United States. (Doc. 1 ¶ 19; Doc. 25, Ex. B ¶¶ 4-5.)

DLO employed Hope as Vice President of Sales beginning on

2

March 1, 2006[1] (Doc. 1 ¶¶ 11-13; Doc. 25, Ex. C, Pt. 1 at 12), and he was one of approximately eight officers of the company (Doc. 28, Ex. D, Pt. 2 at 32-36, 37-38, Pt. 3 at 1-37, Pt. 4 at 1-34). Hope is a resident of South Carolina and worked out of DLO's office in Charleston, South Carolina, having relocated from Texas to do so. (Doc. 1 ¶¶ 3, 12; Doc. 25, Ex. C, Pt. 1 at 7.) As the Vice President of Sales, Hope was assigned to work with DLO clients in the United States and Canada. (Doc. 1 ¶¶ 11-13; Doc. 25, Ex. C, Pt. 1 at 12.) He was responsible for, and took a lead role in, assembling client programs, interfacing with buyers and merchants at key accounts, working with DLO employees on changes to products, and marketing DLO's products. (Doc. 1 ¶ 14; Doc. 25, Ex. C, Pt. 1 at 13-14.) Among his duties, Hope managed a team of employees responsible for serving Best Buy. (Doc. 1 ¶ 15.) DLO's sales to Best Buy accounted for more than one-half of the total annual revenue in its MP3 and mobile phone accessories category, and exceeded $75,000,000. (Doc. 1 ¶ 19.) Other top clients of DLO or its successor include Wal-Mart, Target, Sears/Kmart, Sam's Club, Costco, Radio Shack, and Apple Retail Store. (Doc. 39, Ex. A at 4, Ex. B at 13-15.)

---

[1]

In 2008, Philips changed Hope's title to "Marketing Manager, North America," as part of a business reorganization. (Doc. 25, Ex. C, Pt. 1 at 19.) Although Hope initially claimed that this position was a demotion, he admitted in his deposition that he continued to perform the same job duties. (Doc. 25, Ex. C, Pt. 1 at 15-19.)

Through this management position, Hope was privy to confidential and proprietary information of DLO and its clients. Hope received information regarding DLO's product roadmaps and product development efforts. (Doc. 1 ¶ 17; Doc. 25, Ex. C, Pt. 1 at 13-14.) As the key communication link between DLO's clients and its development team, Hope also had access to the specific needs and preferences of DLO's clients. (Doc. 1 ¶¶ 16-17; Doc. 25, Ex. C, Pt. 1 at 13-14.) Furthermore, DLO enabled Hope to develop relationships with its existing and potential customers and to learn about their business operations, needs, and processes. (Doc. 1 ¶ 20.)

On December 28, 2006, Hope executed a Letter Agreement with DLO ("Letter Agreement"). (Doc. 1, Ex. 1.) In exchange for a promise to pay him $180,000 in four installments, Hope agreed to a covenant not to compete with DLO ("Non-Competition Agreement" or "Agreement"). (Doc. 1, Ex. 1 §§ 2, 2.1, 3.) In pertinent part, this Non-Competition Agreement prohibits Hope from working for a direct competitor in the same or similar position as he held with DLO. (Doc. 1, Ex. 1 § 3.1.) This restriction applies during his employment with DLO and for two years thereafter. (Doc. 1, Ex. 1 § 3.1.) It covers geographic areas where DLO carries on or transacts business, as well as where it sells or markets its products. (Doc. 1, Ex. 1 § 3.1.)

4

Further, in the Letter Agreement, Hope acknowledged that his "experience and capabilities are such that [he] can obtain other work in the Territory (as defined [in the Non-Competition Agreement]) without competing against the Company." (Doc. 1, Ex. 1 § 3.) He also agreed that "the enforcement of the covenants contained in this letter agreement will not prevent [him] from earning a livelihood or otherwise impose undue hardship on [him]." (Doc. 1, Ex. 1 § 3.) Finally, Hope acknowledged that the Letter Agreement inures to the benefit of DLO's successors (Doc. 1, Ex. 1 § 7(h)), and that any violation entitles DLO to injunctive relief (Doc. 1, Ex. 1 § 7(n)).

In 2008, while still working for DLO but following Philips' purchase, Hope began to plan to leave. On February 4, 2008, he set up a private e-mail account and began communicating with other current and former DLO executives and employees about post-DLO employment opportunities, which he called the "Afterlife." (Doc. 25, Ex. C, Pt. 1 at 20-24, Pt. 2 at Ex. 9.) Hope concedes that the group decided to compete directly with DLO by October 2008 (Doc. 25, Ex. C, Pt. 1 at 25-26, 29), yet e-mails reveal that he met with a manufacturer in as early as June 2008 to explore the possibility of making products similar to, and competitive with, those sold by DLO (Doc. 25, Ex. C, Pt. 1 at 28, Pt. 2 at Ex. 11). The June 2008 e-mails also identified further

5

steps, such as pricing by category, inspection of sample products, and logistics and warehousing. (Doc. 25, Ex. C, Pt. 2 at Ex. 11.)

This "Afterlife" group exchanged several other e-mails and documents throughout 2008 as part of their extensive planning for their new business venture. Hope selected the name "Riot Outfitters, LLC" (Doc. 25, Ex. C at 42-43), paralleling his employer's name of Digital Lifestyle Outfitters. These e-mails included discussions about product pricing, financial forecasts, product information, development of prototypes, organization of business entities, and recruitment of sale representatives, among other topics. (Doc. 25, Ex. C, Pt. 1 at 29-34, 41-63, 67-69, Pt. 2 at Exs. 12-13, Pts. 3-5 at Ex. 20, Pt. 5 at Exs. 21, 23-25, 27-28, 30.) In August 2008, while still employed by DLO/Philips, Hope procured a website domain name for Riot Outfitters. (Doc. 1 ¶ 30; Doc. 25, Ex. C, Pt. 1 at 35, 42-43.)

Hope performed much of his planning during company time and using confidential materials of DLO/Philips. He sent several e-mails during working hours and even met with a potential investor while on a DLO business trip. (Doc. 25, Ex. C, Pt. 1 at 5-6, Pt. 2 at Ex. 12, Pts. 3-5 at Ex. 20.) Without DLO's knowledge or permission, Hope appropriated a DLO 2008 business plan as a template for the business plan for Riot Outfitters. (Doc. 25,

Ex. C, Pt. 1 at 36–40, Pts. 2–3 at Ex. 19.) He also secretly distributed DLO's confidential financial calculator, which DLO used to evaluate the profitability of its products, to one of his new partners. (Doc. 25, Ex. C., Pt. 1 at 52–57, Pt. 5 at Ex. 25.) Furthermore, Hope prepared a PowerPoint presentation for Riot Outfitters using a select market data analysis that DLO had identified and ordered from a third-party vendor at significant cost and which DLO regarded to be confidential. (Doc. 25, Ex. C, Pt. 1 at 41–45, Pts. 3–5 at Ex. 20.) In circulating the stolen DLO information, one of Hope's confederates warned, "[k]eep this between us" and "this is super confidential since it belongs to Philips/DLO." (Doc. 25, Ex. C, Pt. 5 at Exs. 31, 36.)

On December 16, 2008, the day after Riot Outfitters secured financing, Hope announced his resignation from DLO. (Doc. 25, Ex. C, Pt. 1 at 58–59, 64–65, Pt. 5 at Ex. 27.) Upon resigning, he falsely told several individuals at DLO that he would be working with his father's contract labor firm for photo processing machines. (Doc. 1 ¶¶ 24–25; Doc. 25, Ex. C, Pt. 1 at 66.) Hope never breathed a word about working for Riot Outfitters in direct competition with DLO. (Doc. 1 ¶ 25; Doc. 25, Ex. C, Pt. 1 at 65–67; Doc. 28, Ex. D.) Before leaving DLO, Hope also arranged to purchase his company laptop computer and ignored a written directive to remove all proprietary

information.  (Doc. 28, Ex. C at Ex. 33.)  Hope's resignation took effect on December 31, 2008, yet he remained on the payroll through January 2, 2009, because of the New Year's holiday. (Doc. 25, Ex. E ¶¶ 4-5.)

In January 2009, immediately after resigning from DLO, Hope began working with Riot Outfitters.  (Doc. 1 ¶ 26; Letter from Maureen Rouse—Ayoub, Bodman, LLP, to Susan Pyle Dion, McGuireWoods, LLP (May 15, 2009).)  Riot Outfitters manufactures MP3 and mobile telephone accessories and sells its products at Best Buy, among other places, in direct competition with Philips. (Doc. 1 ¶¶ 28, 31.)  Hope was involved in developing Riot Outfitters' relationship with Best Buy, one of his former customers at DLO, and executed the Best Buy contract on behalf of Riot Outfitters.  (Doc. 25, Ex. C at 6.)  While working for Riot Outfitters, Hope obtained DLO's product cost and pricing information regarding Best Buy sales, DLO's proposed packaging information for a September 2009 product launch, and a DLO year-end financial report from Best Buy.  (Doc. 25, Ex. C, Pt. 5 at Exs. 31, 34-36.)  Hope received this information, which he concedes was confidential, from former DLO employees working for Riot Outfitters and from a third-party sales representative. (Doc. 25, Ex. C, Pt. 1 at 70-72, Pt. 2 at 1-4.)

Philips contends it discovered Hope's competitive activity

8

in late April 2009. After cease and desist demands went unheeded, Philips filed a Verified Complaint with this court on May 19, 2009, asserting claims for (1) breach of the Non-Competition Agreement, (2) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, (3) misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 through 66-157, and (4) breach of fiduciary duty. This court entered a TRO on June 1, 2009, and renewed it by consent.

## II. ANALYSIS

This court has jurisdiction pursuant to 28 U.S.C. § 1332.[2] (Doc. 1 ¶¶ 1, 4.) A preliminary injunction is "an extraordinary remedy which is to be applied only in the limited circumstances which clearly demand it." <u>Direx Israel, Ltd. v. Breakthrough Med. Corp.</u>, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks and citation omitted). The purpose of a preliminary injunction is to "preserve[] the status quo pending a final trial

---

[2]

    Section 7(n) of the Letter Agreement provides that "[a]ny controversy or claim arising out of or relating to this letter agreement shall be settled by arbitration." (Doc. 1, Ex. 1 § 7(n).) However, this provision also allows DLO and its successors to obtain an injunction "restraining [Hope] from committing any violation or threatened violation" of the Letter Agreement. (Doc. 1, Ex. 1 § 7(n).) While the parties differ on the scope of the arbitration provision, they do not dispute that this court has jurisdiction to enter a preliminary injunction "to preserve the status quo pending the arbitration of the parties' dispute." <u>Merrill Lynch, Pierce, Fenner & Smith v. Bradley</u>, 756 F.2d 1048, 1052 (4th Cir. 1985).

on the merits." _Hoechst Diafoil Co. v. Nan Ya Plastics Corp._, 174 F.3d 411, 422 (4th Cir. 1999).

The requirements for obtaining preliminary injunctive relief in this circuit are set forth in _Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co._, 550 F.2d 189, 195 (4th Cir. 1977). _See_ _Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co._, 22 F.3d 546, 551 (4th Cir. 1994). Under this circuit's "balance of hardships" test, the four factors to be considered are "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." _Direx_, 952 F.2d at 812. The balance of hardships "are the two most important factors," _id._, and that analysis should precede the determination of any likelihood of success. _Id._ at 813. "The weight to be given each factor varies according to the circumstances of each case." _James A. Merritt & Sons v. Marsh_, 791 F.2d 328, 330 (4th Cir. 1986). Philips bears the burden of demonstrating that the _Blackwelder_ factors favor a preliminary injunction. _Manning v. Hunt_, 119 F.3d 254, 265 (4th Cir. 1997).

## A. Balance of Hardships

Under the first <u>Blackwelder</u> factor, a plaintiff must make a "clear showing" of actual and immediate irreparable harm. <u>Direx</u>, 952 F.2d at 812 (quoting <u>Dan River, Inc. v. Icahn</u>, 701 F.2d 278, 284 (4th Cir. 1983)). Loss of permanent relationships with customers and loss of proprietary information may constitute irreparable harm. <u>E.g.</u>, <u>Multi-Channel</u>, 22 F.3d at 552 (affirming district court finding of irreparable harm due to threat of permanent loss of customers and potential loss of goodwill); <u>Merrill Lynch</u>, 756 F.2d at 1055 (holding irreparable harm established where employer faced loss of customers when employee resigned and attempted to take former clients); <u>see Zahodnick v. Int'l Bus. Mach. Corp.</u>, 135 F.3d 911, 915 (4th Cir. 1997) (per curiam) (affirming a preliminary injunction that prohibited defendant from disclosing confidential information to third parties in violation of a confidentiality agreement).

Philips has made a clear showing of actual and immediate irreparable harm in the absence of an injunction against Hope. For example, Philips proffered evidence that Hope's alleged breach of the Non-Competition Agreement undermines its relationship with its customers, including its most significant – Best Buy, and could result in the further loss of customer relationships and goodwill. Philips also has forecast evidence showing that Hope's alleged misappropriation and use of trade

11

secrets, such as DLO's business plan, financial calculator, and product information, could provide an unfair competitive advantage to Riot Outfitters, which is a direct competitor.

Under the second _Blackwelder_ factor, the court must determine the likelihood of harm to Hope from the grant of an injunction. _In re Microsoft Corp. Antitrust Litig._, 333 F.3d 517, 526 (4th Cir. 2003); _Direx_, 952 F.2d at 812. In response to the motion for a TRO, Hope argued that enforcement of the Non-Competition Agreement would deprive him of a livelihood. Hope conspicuously abandons that argument in response to the motion for preliminary injunction, and for good reason. Hope is a sophisticated businessman and one of approximately eight former senior officers of DLO. In the Letter Agreement, Hope acknowledged that his:

> experience and capabilities are such that [he] can
> obtain other work in the Territory (as defined [in the
> Non-Competition Agreement]) without competing against
> the Company, and that the enforcement of the covenants
> contained in this letter agreement will not prevent
> [him] from earning a livelihood or otherwise impose
> undue hardship on [him].

(Doc. 1, Ex. 1 § 3.) In other words, an injunction would only require Hope to do that which he agreed to do in the Non-Competition Agreement and would prevent him from engaging in illegal and unethical conduct. That Hope is capable of other work is borne out by his testimony. Previous to his DLO

12

employment, he sold computers, entertainment software, and other products. In seeking to avoid responsibility for breaching the Non-Competition Agreement, Hope testified that as of June 2008 he was considering manufacturing golf bags, marine cooler devices, and back packs rather than products that compete with DLO. (Doc. 25, Ex. C, Pt. 1 at 27-28.)

Furthermore, Hope's position with Riot Outfitters is nebulous. Hope claims that he was the co-founder of Riot Outfitters, and he signed the vendor agreement with Best Buy as a "co-owner" and "co-founder." (Doc. 25, Ex. C, Pt. 1 at 3, Pt. 2 at Exs. 1 & 2.) Hope also asserts that he does "[a]nything and everything that possibly needs to be done[,] including marketing, sales, packaging design, [and] logistical work." (Doc. 25, Ex. C, Pt. 1 at 3.) But the record reveals that Hope is neither an employee of, nor has any employment contract with, Riot Outfitters, lacks any defined job description or responsibilities, and merely serves vaguely as an independent consultant. (Doc. 25, Ex. C, Pt. 1 at 3-4; Letter from Maureen Rouse—Ayoub, Bodman, LLP, to Susan Pyle Dion, McGuireWoods, LLP (May 15, 2009).) There is no evidence supporting Hope's claim that he is a co-owner of Riot Outfitters. To the contrary, Riot Outfitters appears to have only one investor, and it is not Hope. (Doc. 25, Ex. C, Pt. 1 at 5-6, Pt. 5 at Ex. 27.) Thus, because

the likelihood of harm to Hope is low, the balance of hardships tips decidedly in favor of Philips.

## B. Likelihood of Success on the Merits

If the balance of hardships tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Blackwelder, 550 F.2d 195; accord In re Microsoft, 333 F.3d at 526. This standard is less demanding on the plaintiff than the showing required where the balance tips less so in its favor. Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991). Even so, "there must at least be a strong showing that the case raises grave or serious questions." Berry v. Bean, 796 F.2d 713, 716 (4th Cir. 1986) (quoting James A. Merritt & Sons, 791 F.2d at 330). Philips seeks to enforce a preliminary injunction based on the Non-Competition Agreement and the North Carolina Trade Secrets Protection Act.[3]

### 1. Non-Competition Agreement

_____

[3]

In the memorandum supporting the motion for a preliminary injunction, Philips also sought injunctive relief based on the North Carolina Unfair and Deceptive Trade Practices Act and breach of fiduciary duty. (Doc. 8 at 12-13, 15-17.) Philips abandoned these claims at the TRO hearing and did not raise them in its post-discovery briefing on the preliminary injunction motion or at the hearing. Thus, they will not be considered here.

14

Philips claims that it warrants a preliminary injunction because Hope breached the Non-Competition Agreement. Hope contends that Philips lacks standing to enforce the Non-Competition Agreement and that it is invalid and unenforceable. The Letter Agreement recites that the Non-Competition Agreement shall be construed under the law of North Carolina (Doc. 1, Ex. 1 § 7(n)), where DLO's headquarters were located at the time the Agreement was executed, which the court will apply. <u>Bueltel v. Lumber Mut. Ins. Co.</u>, 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999).

### a. Standing

As a threshold matter, Hope argues that Philips lacks standing to enforce the Non-Competition Agreement because, to the extent Hope bargained for it, he did so with DLO, not Philips. Hope appears to assert that DLO never specifically assigned the Non-Competition Agreement to Philips. Hope also claims that the Letter Agreement contains "seemingly irreconcilable provisions" regarding the assignability of the Non-Competition Agreement.

Under North Carolina law, a corporation generally may enforce a non-competition agreement executed by an employee of its predecessor in interest. "'[A] covenant not to compete with a business is assignable'" as part of an asset purchase

15

agreement.[4]  Reynolds & Reynolds Co. v. Tart, 955 F. Supp. 547, 556 (W.D.N.C. 1997) (quoting Keith v. Day, 81 N.C. App. 185, 195, 343 S.E.2d 562, 568 (1986)); Better Bus. Forms & Prods., Inc. v. Craver, No. 07 CVS 3030, 2007 NCBC LEXIS 34, at *11 (N.C. Super. Ct. Nov. 1, 2007); see Covenant Equip. Corp. v. Forklift Pro, Inc., No. 07 CVS 21932, 2008 NCBC LEXIS 12, at *24 (N.C. Super. Ct. May 1, 2008).  Although these cases specifically addressed asset purchase agreements, they indicate that a non-competition agreement is enforceable by an entity acquiring the agreement through a stock purchase.  Covenant, 2008 NCBC LEXIS 12, at *26, 26 n.11; Craver, 2007 NCBC LEXIS 34, at *17.  North Carolina law also provides that, in the event of a merger, the surviving corporation succeeds to "all real estate and other property owned by each merging corporation" by operation of law, without the need for an express assignment.  N.C. Gen. Stat. § 55-11-06(a)(2); Econo-Travel Motor Hotel Corp. v. Taylor, 301 N.C. 200, 204, 271 S.E.2d 54, 58 (1980) (applying the predecessor statute); see Dimension Data N. Am., Inc. v. NetStar-1, Inc., 226 F.R.D. 528, 530 (E.D.N.C. 2005) (finding that, upon merger, the surviving company acquired all right, title, and interest to a

---

[4]

Furthermore, in dicta, a federal district court construing North Carolina law rejected the argument that a non-competition agreement was not assignable when the agreement expressly stated that it was assignable and a subsequent asset purchase agreement never addressed the issue.  Ne. Solite Corp. v. Unicon Concrete, LLC, No. 1:98CV00872, 1999 U.S. Dist. LEXIS 9762, at *6 (M.D.N.C. Apr. 19, 1999).

non-compete agreement executed between its predecessor-in-interest and an employee).

In this case, Philips has forecast evidence sufficient to demonstrate standing to enforce the Non-Competition Agreement. On December 28, 2006, Hope executed the Letter Agreement containing the Non-Competition Agreement with DLO. Although Philips purchased all the issued and outstanding capital stock of DLO in May 2007 (Doc. 28, Ex. D, Pt. 2 at 37), Philips admits that the stock purchase agreement did not assign the Non-Competition Agreement (Doc. 37 at 17). Nevertheless, Philips has forecast evidence indicating that DLO maintained the right to enforce the Non-Competition Agreement after the consummation of the stock purchase agreement. For example, the stock purchase agreement appears to have listed the Letter Agreement on a schedule of assets. (Doc. 37 at 11, 13-14.) Philips also operated DLO as a free-standing, separate legal entity within its structure until it merged into Philips on January 1, 2009. (Doc. 25, Ex. A at 3-4; Doc. 29, Ex. D, Pt. 5 at 25; Doc. 37 at 17.)

Even though the stock purchase agreement transferred control of DLO to Philips, Hope expressly consented to such a transfer. Section 7(h) of the Letter Agreement provides that it "shall be binding upon and inure to the benefit of [DLO], its successors and assigns, and on [Hope] and [his] respective heirs, executors,

17

and legal representatives."[5]   (Doc. 1, Ex. 1 § 7(h).)   Thus, under North Carolina law, DLO maintained its right to enforce the Non-Competition Agreement after the stock purchase agreement.

Philips also has forecast evidence indicating that it has standing to enforce the Non-Competition Agreement upon the merger.   The merger documents provide that DLO Holdings, Inc., and Netalog, Inc., merged into a single corporation, Netalog, Inc., pursuant to Chapter 55 of the North Carolina Business Corporation Act.   (Doc. 29, Ex. D, Pt. 5 at 25.)   Section 55-11-06(a)(2) of the North Carolina Business Corporation Act states that the surviving corporation, Netalog, Inc., succeeds to "all real estate and other property owned by each merging corporation," which would include the Non-Competition Agreement, by operation of law.   N.C. Gen. Stat. § 55-11-06(a)(2).   The merger took effect on January 1, 2009.   Thus, Philips has standing to enforce the Non-Competition Agreement against Hope.

### b.   Validity of Non-Competition Agreement

---

[5]

Hope argues that this provision is "seemingly irreconcilable" with section 7(f), which states that "[n]either this letter agreement nor any interest or right therein or part thereof may be sold, encumbered, pledged, assigned or transferred in any manner other than by will or by the applicable laws of descent and distribution."   (Doc. 1, Ex. 1 § 7(f).)   Although section 7(f) does limit the assignability of the Non-Competition Agreement, it is easily reconcilable with section 7(h) because it mentions a will and the laws of descent and distribution. Because wills and the laws of descent and distribution do not apply to corporations, this non-reciprocal provision only restricts Hope's right to assign the Non-Competition Agreement.

18

North Carolina courts have long stated that covenants not to compete between an employer and an employee "are not viewed favorably." VisionAIR, Inc. v. James, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (internal quotation marks and citation omitted). Under North Carolina law, a covenant not to compete is valid if it is (1) in writing, (2) made part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest of the employer. A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 402-03, 302 S.E.2d 754, 760 (1983). In this case, the Non-Competition Agreement is in writing, is part of Hope's employment contract, and recites that the $180,000 paid to Hope was adequate consideration. (Doc. 1, Ex. 1 § 3.) Thus, the parties dispute only whether it is reasonable as to territory, time, and scope of activity.

### 1. Territory and Time

"[T]he time and geographic limitations of a covenant-not-to-compete must be considered in tandem, such that a longer period of time is acceptable where the geographic restriction is relatively small, and vice versa." Kinesis Adver., Inc. v. Hill, 187 N.C. App. 1, 13-14, 652 S.E.2d 284, 294 (2007) (internal quotation marks and citation omitted). In assessing the reasonableness of the time and geographic limitations, North

19

Carolina courts consider six overlapping factors: "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation." Okuma Am. Corp. v. Bowers, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620 (2007).

### a. Territory

A geographic restriction is reasonable "only to the extent it protects the legitimate interests of the employer in maintaining [its] customers." Hartman v. W.H. Odell & Assocs., Inc., 117 N.C. App. 307, 312, 450 S.E.2d 912, 917 (1994) (emphasis omitted). Where a primary purpose of the non-competition agreement is to protect the employer's relationship with its customers, the employer must "show where its customers are located and that the geographic scope of the covenant is necessary to maintain those customer relationships." Id. at 312, 450 S.E.2d at 917. Alternatively, an employer may show the validity of territorial restrictions based on client location rather than geographic area. United Labs., Inc. v. Kuykendall, 322 N.C. 643, 660, 370 S.E.2d 375, 386 (1988).

In this case, the Non-Competition Agreement defines the term

20

"territory" as follows:

> the geographic areas and locations where: (i) the
> Company carries on or transacts its business, (ii) the
> Company sells or markets its products or services, *or*
> (iii) the Company's customers are located; including
> without limitation (A) the world, (B) the United States
> of America, (C) each of the states of the Untied States
> of America, (D) the State of North Carolina, (E) the
> State of South Carolina, (F) each county within the
> State of North Carolina, (G) each county within the
> State of South Carolina, (H) the territory within a 100
> mile radius of the Company's office in Durham, North
> Carolina, (H) [sic] the territory within a 100 mile
> radius of the Company's office in Charleston, South
> Carolina, *and* (I) the territory within a 100 mile
> radius of each other office of the Company (whether now
> existing or hereafter established).

(Doc. 1, Ex. 1 § 3.1 (emphasis added).) This provision sets

forth at least three distinctly separate alternatives for the

definition of "territory," which are labeled (i), (ii), and

(iii).

Philips has made a sufficient showing to support a

preliminary injunction against Hope under subsections (i) and

(ii).[6]  These subsections include "the geographic areas or

---

[6]

In light of this conclusion, the court need not adjudicate Philips'
alternative request to enforce a nationwide injunction against Hope under
subsection (iii)(B), which covers "the United States of America." North
Carolina law permits courts to "choose not to enforce a distinctly
separable part of a covenant in order to render the provision reasonable"
as long as courts do not "otherwise revise or rewrite the covenant."
Hartman, 117 N.C. App. at 317, 450 S.E.2d at 920 (noting that North
Carolina law "severely limits" a court's ability to "blue pencil"
offending terms); accord VisionAIR, 167 N.C. App. at 508, 606 S.E.2d at
362. Thus, under North Carolina law, the court may use its "blue pencil"
to excise subsection (iii) from the definition of territory, particularly
where this provision is separated by the term "or," indicating that the
three parts are distinctly separable. This approach is also consistent

21

locations where . . . the Company carries on or transacts its business, . . . [or] the Company sells or markets its products or services." Philips has proffered a list of thousands of specific locations nationwide where it sells its products through multiple, well-known national and regional third-party retailers. (Doc. 25, Ex. B ¶¶ 4-5, Ex. B at Ex. A.) The list includes retail stores throughout every state, as well as at least one store in the District of Columbia. (Doc. 25, Ex. B at Ex. A.) Although Hope argues that DLO sells its products only at the corporate headquarters of those retailers, the evidence does not indicate that the retailers rebrand the products, repackage them, or otherwise make the products their own before reselling them. Based on this evidence, or lack thereof, the retailers appear to serve merely as a conduit for DLO or its successor to sell or market its products to the ultimate end-user customers.

Philips has also proffered sufficient evidence of Hope's high-level role at DLO to support application of this territorial restriction at this stage. Hope was DLO's Vice President of Sales, with responsibility for the entire United States. He was in close contact with DLO's primary client, Best Buy, from which DLO generated approximately $75,000,000 in revenues per year. He

---

with the Letter Agreement, which provides that the parties intended to sever any unenforceable provisions from the remainder. (Doc. 1, Ex. 1 § 7(i).) The court finds that such a result is reasonable under the facts of this case.

also acquired extensive knowledge of other customers through his supervision of a sales team. Hope acknowledges that he helped team members prepare for meetings, gathered information, data, and material to provide to clients, and developed marketing plans. (Doc. 25, Ex. C, Pt. 1 at 13.) In this role, Hope admits that he received information from DLO's customers about their requirements and adapted his marketing approach to meet those requirements. (Doc. 25, Ex. C, Pt. 1 at 13-14.)

Now, through Riot Outfitters, Hope has entered into a vendor agreement with Best Buy and sells Riot Outfitters' MP3 and mobile phone accessories as "new" products in direct competition with Philips. Hope's own business plan for Riot Outfitters identifies its market as "global" and "focusing on mobile devices such as cell phones and MP3 players" for accessories – thus covering at least the DLO/Philips nationwide market. (Doc. 25 Ex. C, Pts. 2-3 at Ex. 19.) Although Hope may not have personally maintained extensive contacts with all of DLO's clients, the record indicates that, through his supervision of a team of sales agents, he had high-level knowledge of these other nationwide clients (including well known national retailers such as Target, Apple Retail, Staples, and Office Depot), and knowledge of DLO's sensitive competitive information. See Precision Walls, Inc. v. Servie, 152 N.C. App. 630, 638, 568 S.E.2d 267, 273 (2002)

23

(considering employee's knowledge of pricing, costs, margins, etc., in upholding covenant in states where employee did not personally work).

Though certainly not the norm, North Carolina courts have upheld nationwide restrictions on former employees in at least three reported cases. <u>Okuma</u>, 181 N.C. App. at 92, 638 S.E.2d at 622 (upholding injunction throughout North and South America against vice president of customer service, a senior executive, who left for competitor); <u>Mkt. Am., Inc. v. Christman-Orth</u>, 135 N.C. App. 143, 155, 520 S.E.2d 570, 579 (1999) (upholding nationwide restriction against salesperson); <u>Harwell Enters., Inc. v. Heim</u>, 276 N.C. 475, 481, 173 S.E.2d 316, 320 (1970) (upholding nationwide restriction without contest). Under the facts of this case, the court concludes that Philips has raised serious questions that are fair ground for litigation that a nationwide restriction is supportable based on Hope's client contacts, his knowledge of DLO's business, the area assigned to Hope and the nature of his duties, and the fact that DLO competes nationally.

### b.  Time

As a general proposition, a non-competition agreement of two years is "well within the range that the North Carolina courts have deemed reasonable." <u>Lockhart v. Home-Grown Indus. of Ga.,</u>

24

<u>Inc.</u>, No. 3:07-CV-297, 2007 U.S. Dist. LEXIS 67256, at *20 (W.D.N.C. Sept. 10, 2007) (citing cases that have upheld covenants not to compete of two, ten, and fifteen years); <u>see Static Control Components, Inc. v. Darkprint Imaging, Inc.</u>, 240 F. Supp. 2d 465, 474 (M.D.N.C. 2002) (noting that a covenant not to compete of two years is not *per se* unreasonable); <u>Harwell</u>, 276 N.C. at 481, 173 S.E.2d at 320 (upholding two-year nationwide restriction); <u>Kinesis</u>, 187 N.C. App. at 14, 652 S.E.2d at 294 (upholding an uncontested two-year covenant not to compete).

In this case, Hope agreed that he would not engage in competitive business activities "for a period of two (2) years following the expiration or termination of [his] employment" with DLO or its successor. (Doc. 1, Ex. 1 § 3.1.) Although Hope correctly observes that nationwide restrictions typically feature a shorter time period, <u>Okuma</u>, 181 N.C. App. at 92, 638 S.E.2d at 622 (upholding six-month injunction throughout North and South America against vice president of customer service, a senior executive, who left for competitor); <u>Mkt. Am.</u>, 135 N.C. App. at 155, 520 S.E.2d at 579 (upholding six-month nationwide restriction against salesperson), the North Carolina Supreme Court has upheld a two-year nationwide restriction. <u>Harwell</u>, 276 N.C. at 481, 173 S.E.2d at 320 (upholding two-year nationwide restriction without contest). Furthermore, at this preliminary

stage, Philips has indicated that this two-year term is reasonable because its customer relationships are viable for the full term. Thus, Philips has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus for more deliberate investigation.

### c.    Enforceable Period

Hope and Philips disagree on the exact event that triggered the two-year period of the Non-Competition Agreement. Hope argues that the two-year period began to run upon his resignation from DLO on May 9, 2007, and therefore has expired. Philips contends that only Hope's resignation in December 2008 triggered the Non-Competition Agreement.

Following the execution of the stock purchase agreement, Hope "submitt[ed] his resignation as Vice President of Sales and any other office," effective immediately after the closing on May 9, 2007 (Doc. 28, Ex. D, Pt. 1 at 1, Pt. 3 at 6.) Philips argues that Hope's 2007 resignation letter was merely a formality related to the closing of the stock acquisition. However, the Non-Competition Agreement specifically provides that the two-year period is triggered by "the expiration or termination of . . . employment" with DLO, "irrespective of the manner or cause of such termination." (Doc. 1, Ex. 1 § 3.1.) Philips also argues

26

that Hope merely resigned as an officer and not as an employee. But Hope did not hold any position at DLO other than Vice President. Even though Philips notes that Hope served as the Vice President of Sales for the rest of 2007, remained on the DLO payroll, and did not have a written employment agreement with DLO or Philips, these facts are consistent with Hope's at-will employment status after his resignation. Further, Hope has provided evidence that other senior DLO officers who also had to tender their resignations as part of the stock sale to Philips negotiated new employment contracts with new covenants not to compete. That Hope did not negotiate a new contract does not vitiate the effectiveness of his resignation. According to federal tax documents and a senior executive with Philips, Hope was an employee of Philips as of 2007. (Doc. 28, Ex. B; Doc. 33 at 6.) Finally, Philips claims that Hope continued to receive payments under the Letter Agreement. While the Letter Agreement provides that Hope would forfeit his right to receive those payments if he "quit, resign[ed], or otherwise *voluntarily* cease[d] to be an employee" (Doc. 1, Ex. 1 § 2.3(a) (emphasis added)), Philips admits that Hope's resignation letter (as was that of all other officers) was *involuntarily* compelled by Philips in the stock purchase agreement.

Although the two-year period began to run on May 9, 2007, it

did not expire on May 9, 2009. Section 3.4 of the Non-Competition Agreement provides that "[t]he periods of protection . . . shall not be reduced by any period of time during which [Hope is] not in compliance therewith." (Doc. 1, Ex. 1 § 3.4.) Such tolling provisions appear to be valid under North Carolina law. Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 417 (E.D.N.C. 2006); QSP, Inc. v. Hair, 152 N.C. App. 174, 177-78, 566 S.E.2d 851, 853 (2002). Philips has forecast evidence indicating that Hope was not in compliance with the Non-Competition Agreement at least by mid-June 2008. In a June 23, 2008, e-mail, Hope referenced a prior meeting with a manufacturer and discussed product pricing, inspection of sample products, and logistics and warehousing for products similar to those sold by DLO and which are now sold by Riot Outfitters. Philips also has forecast evidence that Hope continued to engage in competition with Riot Outfitters until at least May 20, 2009, even though he had voluntarily agreed to cease all activities as of May 15, 2009. Based on the record evidence, Hope appears to have been in breach of the Non-Competition Agreement from approximately mid-June 2008 until mid-May 2009. Thus, the expiration of the Non-Competition Agreement should be tolled for eleven months, until April 9, 2010.

### 2. Legitimate Business Interests

A non-competition agreement "must be no wider in scope than is necessary to protect the business of the employer." Med. Staffing Network, Inc. v. Ridgway, ___ N.C. App. ___, 670 S.E.2d 321, 327 (2009) (quoting Manpower v. Hedgecock, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979)). If a non-competition agreement "is too broad to be a reasonable protection to the employer's business[,] it will not enforced." Whittaker Gen. Med. Corp. v. Daniel, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989) (citations omitted).

Under North Carolina law, the "protection of customer relations and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381. A non-competition agreement also is reasonably necessary to protect a legitimate business interest "if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers." A.E.P. Indus., 308 N.C. at 408, 302 S.E.2d at 763 (internal quotation marks and citations omitted). At this preliminary stage, Philips has proffered evidence that the Non-Competition Agreement seeks to protect its legitimate business

29

interests, including customer relationships and confidential information.

North Carolina courts have upheld restrictions barring an employee from working in the same or similar position for a direct competitor. Kinesis, 187 N.C. App. at 14, 652 S.E.2d at 294 (upholding restriction that prohibited the former employees from "dealing with, soliciting the business of, or otherwise conducting business . . . of the type similar to that of [Kinesis]"); Okuma, 181 N.C. App. at 92, 638 S.E.2d at 622 (upholding a covenant that prevented employment with a substantially similar company, unless the position was in an area of the competitor's business which did not compete with the former employer); see Precision Walls, 152 N.C. App. at 638-39, 568 S.E.2d at 273 (finding valid and enforceable a provision barring employment of any kind with a direct competitor, where the former employer held an almost identical position as he held with his former employer).

By contrast, non-competition agreements have been found to be overly broad and unenforceable where they prohibit the former employee from engaging in future work that is distinct from the duties actually performed by that employee. Henley Paper Co. v. McAllister, 253 N.C. 529, 534-35, 117 S.E.2d 431, 434 (1960) (finding a contract to be overly broad and unenforceable where

30

the employee's duties were confined exclusively to the *sale and distribution* of *fine* paper products, yet the restrictive agreement sought to prevent him from engaging in the *manufacture or distribution* of *all* paper or paper products); <u>Med. Staffing</u>, __ N.C. App. at ____, 670 S.E.2d at 327-28 (declining to enforce a covenant that prevented a former employee from working in any business within a sixty-mile radius of Raleigh that competes with the employer's parent or any of its divisions, subsidiaries, affiliates, predecessors, or assignees, even if the former employee's duties had nothing to do with those businesses); <u>Hartman</u>, 117 N.C. App. at 317, 450 S.E.2d at 920 (holding that a covenant is overly broad where "it requires [the former employee] to have no association whatsoever with any business that provides [similar services]" and noting that "[s]uch a covenant would appear to prevent [the former employee] from working as a custodian for any 'entity' which provides [similar] services"); <u>VisionAIR</u>, 167 N.C. App. at 508-09, 606 S.E.2d at 362-63 (refusing to enforce a covenant that barred a former employee from any type of employment with a similar company and even from indirectly owning any similar company); <u>Elec. S., Inc. v. Lewis</u>, 96 N.C. App. 160, 169, 385 S.E.2d 352, 357 (1989) (invalidating a covenant because it focused on the employee's association with another company, wherever located, which may be linked with the

31

company's competitors within the restricted territory).

In this case, the Non-Competition Agreement defines the scope of the employment to be prohibited as a function of the time and territory provisions. (Doc. 1, Ex. 1 § 3.1.) The Agreement prohibits Hope from engaging in "competing business activities" "for [himself] or as an advisor, principal, agent, partner, officer, director, shareholder, employee, consultant or contractor for any other person or entity." (Doc. 1, Ex. 1 § 3.1.) The term "competing business activities" includes the following activities, among others:[7]

---

[7]

The Non-Competition Agreement, in full, purports to prohibit employees from engaging in the following activities:

> (i) performing a job or job duties or services, or holding a position, for a Competing Business that is or are substantially the same as or substantially similar to any job, job duties, services or position that you held or performed for the Company during the twelve (12) months prior to the expiration or termination of your employment with the Company; (ii) being engaged in the ownership, operation or management of a Competing Business; (iii) accepting or performing competing employment or any other competing engagement with, or providing any competing services to or for, a Competing Business; *and/or* (iv) engaging, conducting or participating in any employment or business activity that competes with the Company's business or activities as conducted by the Company, or consistent with its current plans, as of the date of the expiration or termination of his employment with the Company.

(Doc. 1, Ex. 1 § 3.1 (emphasis added).) The court need not decide whether the remaining subsections of this provision are overly broad and unenforceable, as Hope argues, because (1) Philips only seeks to enjoin Hope from engaging in the first activity, Whittaker, 324 N.C. at 528, 379 S.E.2d at 828; and (2) based on the use of the disjunctive "and/or" in this provision, these activities appear to be distinctly separable and susceptible to "blue penciling." Id.; see Elec. S., 96 N.C. App. at 167, 385 S.E.2d at 356. Thus, even if the last three clauses were overly broad, they do not doom the Non-Competition Agreement as a matter of law. Cf. Precision Walls, 152 N.C. App. at 639, 568 S.E.2d at 273 (finding

32

> performing a job or job duties or services, or holding a position, for a Competing Business that is or are substantially the same as or substantially similar to any job, job duties, services or position that you held or performed for the Company during the twelve (12) months prior to the expiration or termination of your employment with the Company.

(Doc. 1, Ex. 1 § 3.1.)   The term "competing business," in turn, means "any other company or business whose principal products or services are the same as, substantially similar to, or otherwise in competition with, the Company's principal products or services, or that otherwise competes with the Company's business or activities."

At this preliminary stage, Philips has demonstrated that the scope of activity in this Non-Competition Agreement is reasonable.    The Non-Competition Agreement, rather than prohibiting all employment with competitors, merely prevents Hope from working for a direct competitor in substantially the same or similar position as he held within the twelve months prior to his resignation from DLO.   The record shows that Hope was the Vice President of Sales during his tenure at DLO.   In this position, Hope assembled customer programs, interfaced with buyers and merchants, worked with DLO employees on changes to products, and marketed the final products.   (Doc. 25, Ex. C, Pt. 1 at 13-14;

---

that "plaintiff's legitimate business interest allows the covenant not to compete to prohibit employment of any kind by defendant with a direct competitor" because plaintiff is not less likely to feel pressure to disclose confidential information).

Doc. 1 ¶ 14.) Although Hope lacks a formal job title with Riot Outfitters, he claims to perform essentially the same duties as he had at DLO. For example, he engages in marketing, sales, packaging, design, and logistics work. (Doc. 25, Ex. C, Pt. 1 at 13.) Riot Outfitters also is a direct competitor of Philips. (Doc. 1 ¶ 28.) In short, the reasonableness of the restriction is demonstrated by Hope's own articulation of the breadth of his knowledge about DLO's business that enabled him to get Riot Outfitters up and running so swiftly.

Thus, at this preliminary stage Philips has raised questions going to the merits of its claims under the Non-Competition Agreement "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." <u>Blackwelder</u>, 550 F.2d at 195.

### 2. Trade Secrets Protection Act

Philips also seeks a preliminary injunction under the North Carolina Trade Secrets Protection Act. This statute provides that "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action." N.C. Gen. Stat. § 66-154(a). A "trade secret" is defined as:

> business or technical information, including but not
> limited to a formula, pattern, program, device,
> compilation of information, method, technique, or
> process that:

34

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[8]

N.C. Gen. Stat. § 66-152(3). Misappropriation is the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." _Id._ § 66-154(a). Misappropriation occurs where there is substantial evidence that the defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." _Id._ § 66-155.

At this stage of the proceedings, Philips has forecast evidence indicating the existence of trade secrets. Customer pricing lists, cost information, confidential customer lists, and

---
[8]

In determining whether information should be classified as a trade secret, courts also consider the following factors:

(1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 174 N.C. App. 49, 53, 620 S.E.2d 222, 226 (2005) (citation omitted).

pricing and bidding formulas may constitute trade secrets. _Sunbelt_, 174 N.C. App. at 53, 620 S.E.2d at 226; _Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc._, 160 N.C. App. 520, 525-26, 586 S.E.2d 507, 511-12 (2003). Courts have refused to protect customer names and addresses or personal relationships with customers as "trade secrets." _UBS PaineWebber, Inc. v. Aiken_, 197 F. Supp. 2d 436, 447-48 (W.D.N.C. 2002); _NovaCare Orthotics & Prosthetics E., Inc. v. Speelman_, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000). Nevertheless, courts have found that special knowledge of customer needs and preferences is a trade secret. _SunBelt_, 174 N.C. App. at 54-56, 620 S.E.2d at 226-28.

In this case, Philips assembled a list of several alleged trade secrets, including the DLO business plan (Doc. 25, Ex. C, Pt. 1 at 36-40, Pts. 2-3 at Ex. 19), customer preferences (Doc. 25, Ex. C, Pt. 1 at 13-14), the financial calculator to determine profitability (known internally within DLO as "the sausage") (Doc. 25, Ex. C, Pt. 1 at 52-57, Pt. 5 at Ex. 25), new packaging plans (Doc. 25, Ex. C, Pt. 2 at 3-4, Pt. 5 at Ex. 36), product costs (Doc. 25, Ex. C, Pt. 2 at 2-3, Pt. 5 at Ex. 35), and customer pricing information (Doc. 25, Ex. C, Pt. 1 at 70-72, Pt. 2 at 1, Pt. 5 at Exs. 31, 34).[9] Philips also appears to claim

─────────────────

[9]

While there may be more, on this record Philips fails to identify any other alleged trade secret "with sufficient particularity so as to enable

36

trade secret protection for market share data that DLO had identified and ordered from a third-party vendor at significant cost.[10] Hope admits that several of these items are, in fact, confidential and proprietary. (Doc. 25, Ex. C, Pt. 1 at 71, 72, Pt. 2 at 1, 3-4.)

Philips also has forecast evidence indicating that Hope misappropriated these trade secrets. Courts have found misappropriation where a former employee had access to confidential information or helped a competitor quickly deliver new products to market. Static Control Components, Inc. v. Darkprint Imaging, Inc., 200 F. Supp. 2d 541, 545-46 (M.D.N.C. 2002). Here, Hope clearly took some of this information himself, yet he argues that his mere *use* of some of the information obtained from a third party (such as DLO pricing, costs, packing information, and sales information to Best Buy) is not misappropriation. The statute says otherwise. Id. § 66-155 (making unlawful acquisition, disclosure and/or use). The fact

_____

a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." Analog Devices, Inc. v. Michalski, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003).

[10] Although this market share data appears to be based on publicly available information, the record contains no evidence that it could be readily ascertained through independent efforts. N.C. Gen. Stat. § 66-152(3). To the contrary, Philips paid somewhere between $35,000 and $75,000 per year to have a vendor collect and analyze the data in the particular format directed by Philips, and it was clearly of economic value to Riot Outfitters. (Doc. 25, Ex. D at 8-12.) Also, DLO's contract with the vendor required DLO to maintain it as confidential.

that Hope also signed a Best Buy vendor agreement on behalf of Riot Outfitters on February 20, 2009, thus enabling it to go to market with a finished product only weeks after he resigned from Philips, supports a claim of misuse. (Doc. 25, Ex. C, Pt. 2 at Exs. 1 & 2.) The record also contains substantial evidence that Hope knew or should have known about the trade secrets. Hope regularly used the trade secrets as part of his job duties, even admitting that he knew the information was confidential and proprietary. Philips also has shown that Hope acquired, disclosed, and used the trade secrets through a myriad of e-mails between Hope and his business partners at Riot Outfitters.

Furthermore, Philips demonstrated that it took measures that, while not robust, were reasonable to protect the information at issue. N.C. Gen. Stat. § 66-152(3); <u>Eli Research, Inc. v. United Commc'ns Group, Inc.</u>, 312 F. Supp. 2d 748, 756-57 (M.D.N.C. 2004); <u>Sunbelt</u>, 174 N.C. App. at 54, 620 S.E.2d at 227; <u>Area Landscaping</u>, 160 N.C. App. at 525-26, 586 S.E.2d at 511-12. For example, Philips sponsored a training course entitled "Ethics and Business" which Hope was required to attend. (Doc. 25, Ex. E ¶ 10.) This course reviewed the company's policy directives that business information is "a corporate asset that must be protected against loss, infringement, and improper use and disclosure" and that "documents and ideas [employees] create while . . . working

38

for Philips belong to Philips." (Doc. 25, Ex. E ¶ 11.)
Following the course, Hope certified that he read and understood
these policy directives and that he would comply with them.[11]
(Doc. 25, Ex. E ¶ 12.) Philips presented evidence that all DLO
employees were required to sign and abide by a confidentiality
agreement, that such an agreement was a condition of Hope's
employment and is referenced as such in the Letter Agreement, and
that the agreement is referenced in the stock acquisition
documents.[12] (Doc. 1, Ex. 1 § 7(k); Doc. 25, Ex. C, Pt. 2 at Ex.
5, Ex. E ¶ 8; Doc. 35 at 3; Doc. 37 at 14; Doc. 39 at 2-3.) This
confidentiality agreement requires employees to acknowledge that
"all information pertaining to [DLO] and/or its clients and
customers is to be considered [c]onfidential." (Doc. 39, Ex. C
at Ex. 6.) Employees must agree not to disclose such information
outside the company or even to make copies of it. (Doc. 39, Ex.

---

[11]

    When Hope purchased his laptop from DLO, after tendering his
resignation, DLO specifically instructed him to remove all confidential
and proprietary information. As an employee, Hope was duty-bound to do
so, but he never did. The record contains no evidence to indicate that
this instruction was not reasonable to maintain secrecy under the
circumstances. Hope testified that he had not used the laptop as a daily
computer since approximately February 2008. (Doc. 28, Ex. C at 25.)
Although Hope admitted that the laptop contained proprietary information
(Doc. 28, Ex. C at 24-25), he stated that the information was stale
because it dated from 2006 or 2007 (Doc. 28, Ex. C at 25.) Because
Philips has not demonstrated that it found any current confidential or
proprietary information on the laptop, the court does not include the
laptop in the trade secret analysis here.

[12]

    This is true even though Philips was unable at this early stage to
locate the actual copy executed by Hope.

C at Ex. 6.)  Under the terms of the confidentiality agreement, these provisions inure to the benefit of Philips as successor in interest.  (Doc. 39, Ex. C at Ex. 6.)  Philips also independently took measures to maintain the secrecy of proprietary information within the company.  (Doc. 28, Ex. D at 8-9, 11.)

Philips warrants an injunction against Hope for misappropriation of trade secrets.  Injunctive relief may be appropriate where the departing employee is not forthright as to his intentions.  Cf. Merck & Co v. Lyon, 941 F. Supp. 1443, 1461-62 (M.D.N.C. 1996) (holding threat of misappropriation shown).  A court also may enjoin "an employee from working for a former employer's competitor where there is a showing of bad faith, underhanded dealing, or inferred misappropriation (justified by circumstances tending to show the new employer plainly lacks comparable technology)."  Analog, 157 N.C. App. at 471 n.4, 579 S.E.2d at 455 n.4; accord Merck & Co., 941 F. Supp. at 1459; Barker Indus, Inc. v. Gould, 146 N.C. App. 561, 565, 553 S.E.2d 227, 230 (2001).

This case presents a sad example of an overzealous employee's egregious disregard for his obligations to his current employer.  Hope not only began competing while on company time, but worse he used company information and work product to do so. He acted surreptitiously, creating a separate email account

40

through which he secreted purloined documents. He purposefully misled his employer and co-workers as to his intention to establish a competing business in an effort to avoid detection. For example, in an e-mail to a former DLO employee in Hong Kong, Hope asked him to "keep any action regarding our new company very quiet. Please do not tell any of the old DLO suppliers that we are working on another business opportunity until the end of the year. I would not want anyone to find out prior to our resignation." (Doc. 25, Ex. C, Pt. 5 at Ex. 24.) Although the record shows that Hope started working towards this new business by approximately June 2008, upon his resignation he purposefully attempted to avoid detection of his activity by telling everyone he planned to work in his father's contract labor business. Hope's actions demonstrate bad faith and underhanded dealing in creating his own competing business during working hours, meeting with a potential investor while on a business trip for Philips, and knowingly using confidential and proprietary information belonging to DLO or its successor to establish the competing business.[13]

### C.   Public Interest

---

[13]

   Bad faith is also evidenced by Hope's behavior regarding the laptop. When Hope purchased it from Philips upon his departure, he blatantly disregarded a direct instruction to remove all confidential and proprietary information. This behavior undercuts Hope's claims that he is not likely to misuse confidential or proprietary information of DLO/Philips.

The court finds that the public interest is served by granting this preliminary injunction. Philips has a legitimate interest in developing its customer relationships and being able to share confidential and proprietary information with its employees without fear it will end up in the hands of a competitor. <u>Travenol Labs., Inc. v. Turner</u>, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976). The public interest is also served by "ensuring that contracts are enforced" and preventing "unethical business behavior." <u>UBS PaineWebber</u>, 197 F. Supp. 2d at 448. These interests outweigh Hope's legitimate interest in remaining free to seek employment with "the highest and most congenial bidder." <u>FMC Corp. v. Cyprus Foote Mineral Co.</u>, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995).

**III. CONCLUSION**

For the foregoing reasons, IT IS THEREFORE ORDERED that Philips' motion for preliminary injunction (Doc. 7) is GRANTED to the extent set forth below.

IT IS FURTHER ORDERED that, until further order of this court:

1. Through April 9, 2010, Hope is hereby enjoined from rendering services to Riot Outfitters, LLC, or any other company that sells MP3 or mobile telephone accessories in the United States;

42

2.   Hope is hereby enjoined from altering, deleting, despoiling, or destroying any information in his possession or within his custody or control, including that stored electronically, that originated from or refers to Philips and/or DLO or any product or customer of theirs, whether obtained directly or indirectly by him from Philips and/or DLO;

3.   Hope shall not use or disclose confidential information he obtained or developed while he was employed by DLO and/or Philips.  The term "confidential information" is defined as the DLO business plan, customer preferences, financial calculator, new packaging, product cost, customer pricing information, and compilation of market data, provided that the definition does not include any such information if it is lawfully available to the general public or, in the case of customer information, if such information was disclosed to Hope by a customer without an associated obligation of confidentiality based in law or contract;

4.   The provisions of this Preliminary Injunction are binding on Hope and all other persons who are in active concert or participation with him, pursuant to Federal Rule of Civil Procedure 65(d)(2)(C); and

5.    Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, this Preliminary Injunction shall become effective upon the posting by Philips of One Hundred Thousand dollars ($100,000) security with the Clerk of Court.[14]

/s/ Thomas D. Schroeder

United States District Judge

June 30, 2009

---

[14]

   The burden rests with Hope to establish the amount of bond necessary to secure against the wrongful issuance of an injunction.  See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996).   Hope has provided no evidence of any income he obtains from Riot Outfitters. Given that Hope is not likely working for free, the court deems that, judging from Hope's 2008 federal W-2 form, $100,000 would be adequate security in this case.

44